**IN THE COURT OF APPEALS OF IOWA**

No. 14-1921
Filed July 22, 2015

IN RE THE MARRIAGE OF JENNIFER M. VELDE
AND ADAM R. VELDE

Upon the Petition of
**JENNIFER M. VELDE,**
     Petitioner-Appellee,

**And Concerning**
**ADAM R. VELDE,**
     Respondent-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Peter A. Keller, Judge.

Adam Velde challenges the district court's modification order denying his request to place the parties' children in his physical care, granting the request of Jennifer Velde to modify the visitation schedule set in the parties' dissolution decree, and awarding Jennifer trial attorney fees. **AFFIRMED AND REMANDED.**

Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson, P.C., West Des Moines, for appellant.

Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des Moines, for appellee.

Considered by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DOYLE, J.**

Adam Velde challenges the district court's modification order denying his request to place the parties' children in his physical care, granting the request of the children's mother, Jennifer Velde, to modify the visitation schedule set in the parties' dissolution decree, and awarding to Jennifer trial attorney fees. We affirm, and because we find an appellate-attorney-fee award to Jennifer is appropriate, we remand the matter to the district court to determine the amount of appellate attorney fees to be paid by Adam and to enter judgment against Adam in a reasonable amount.

### I. Background Facts and Proceedings.

Adam and Jennifer Velde married in 2004 and have three children. In 2011, the parties' marriage was dissolved after their joint stipulation was approved by the district court. Pursuant to the parties' stipulation, it was "in the best interest of the children and the parties [were] in agreement that they [would] share joint legal custody of the children and that the primary physical care, custody and control of the children . . . be awarded to [Jennifer]." Adam was granted liberal and expansive visitation rights.

In September 2013, Jennifer filed an application for modification of the decree after the Iowa Department of Human Services (Department) became involved with the family. Specifically, Adam was arrested for assault causing injury after he spanked the parties' six-year-old child to the point of leaving "deep purple handprint[s] across his buttocks" and grabbed the child by the ear, causing a bruise. The Department determined the abuse allegation was founded, noting the incident was "not considered to be minor due to the severity

of the injuries." Jennifer cited the incident in her application as a material and substantial change of circumstances warranting modification of the parties' prior visitation schedule to limit Adam's visits. Adam answered Jennifer's application for modification and asserted there had been a substantial and material change of circumstances such that the children's physical care placement should be modified to place them in his care.

As part of the Department's involvement with the family, safety services were offered to both Jennifer and Adam after the Department's workers found the parents did "not get along [or] demonstrate the ability to co-parent." It was recommended the parties' three children attend therapy, and family safety, risk, and permanency services be offered to both parents so Adam could demonstrate his "ability to discipline his children without causing harm" and Jennifer could demonstrate her "ability to be firm with her children and set limits with them without bribing." Though the parents' generally participated, their communication ability did not improve. As one service provider noted, the parents had "little to no communication," and both parents had "great concerns with each other regarding the children and their well-being and emotional standpoint," and both parents felt "the other parent emotionally damage[d] the children regarding their communication with each other."

Jennifer's application proceeded to trial in 2014. At that time, there were allegations she had grabbed one of the children by his ankles and dragged him across the floor. Jennifer denied she had dragged the child.

Following trial, the district court entered its modification order denying Adam's request to modify the children's physical care placement and granting

Jennifer's request to limit Adam's visitation. The court found that both parents loved the children and vice versa, but it found the parties' communication had "clearly changed since their divorce," noting it appeared to deteriorate around the time Adam got remarried. Despite the obvious change in the parties' ability to communicate, the court found the change, though significant, did not rise to the level of a material and substantial change. It also found Adam did not demonstrate he could offer care that is superior to that of Jennifer, finding Adam was often "too aggressive and uncompromising in his demands," with a "my way or the highway" mentality. Though it found Jennifer and Adam's parenting styles to be very different, it noted Adam stipulated to the original custody arrangement placing the children in Jennifer's physical care; the fact Adam had now remarried and "established a marital home" did not mean he "suddenly became the better parent." The court concluded it was in the children's best interests that Jennifer "be awarded final decision-making abilities concerning the educational development of the minor children, including where they will attend school, and final decision-making abilities concerning registration of the minor children for extracurricular activities." Additionally, noting the lower burden required to modify the visitation schedule, the court found Jennifer showed a significant change in circumstances had occurred since the entry of the decree, and, as a result, Adam's visitation schedule should be modified to generally provide him visitation every other weekend and one night a week. The court awarded Jennifer trial attorney fees "since she . . . prevailed on the issue of a modification of [Adam's] visitation schedule."

Adam now appeals. Jennifer requests appellate attorney fees.

## II. Scope and Standards of Review.

"We review an order modifying a decree for dissolution of marriage de novo." *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014). Nevertheless, "[b]ecause the trial court had the opportunity to observe the demeanor of the witnesses, we give weight to its findings, particularly with respect to credibility, but we are not bound by them." *In re Marriage of Murphy*, 592 N.W.2d 681, 683 (Iowa 1999); *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.' In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented." (internal citations omitted)). We afford the district court "considerable latitude" in its determination "and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005); *see also Sisson*, 843 N.W.2d at 870. We note that prior cases have little precedential value, "as our determination must depend on the facts of the particular case." *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). Our overriding consideration is the best interests of the child. Iowa R. App. P. 6.904(3)(o). "Utilizing the best-interest standard provides the flexibility necessary to consider unique custody issues on a case-by-case basis." *In re Marriage of Hoffman*, ___ N.W.2d ___, 2015 WL 2137550, at *4 (Iowa 2015) (internal quotation marks and citation omitted).

### III. Discussion.

On appeal, Adam contends the district court erred in continuing the children's placement in Jennifer's physical care because there was a significant and material change in circumstances and he could minister more effectively to the children's needs. Alternatively, he argues the court should not have decreased his visitation with the children. He also challenges the court's award of trial attorney fees to Jennifer. Jennifer requests appellate attorney fees. We address their arguments in turn.

### A. Physical Care.

The objective of physical care "is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). To promote stability in the children's lives, our courts have concluded that "once custody of children has been determined, it should be disturbed only for the most cogent reasons." *Dale v. Pearson*, 555 N.W.2d 243, 245 (Iowa Ct. App.1996). Consequently, changing physical care of children is one of the most significant modifications that can be undertaken. *See In re Marriage of Thielges*, 623 N.W.2d 232, 236 (Iowa Ct. App. 2000).

The parent seeking to modify the physical care provision of a dissolution decree must first establish "there has been a substantial change in circumstances since the time of the decree not contemplated by the court when the decree was entered, which is more or less permanent and relates to the welfare of the child." *In re Marriage of Malloy*, 687 N.W.2d 110, 113 (Iowa Ct. App. 2004). That parent must also demonstrate he or she has "the ability to offer

superior care." *Id.*; *see also In re Marriage of Spears*, 529 N.W.2d 299, 301 (Iowa Ct. App. 1994) (stating "once custody of a child has been fixed, it should be disturbed only for the most cogent reasons"). This is a "heavy burden," and rightly so, given the disruption in the children's lives. *See Thielges*, 623 N.W.2d at 235–37; *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 213 (Iowa Ct. App. 1994). Consequently, physical care issues are not to be resolved based upon perceived fairness to the spouses or merely choosing which home is better; rather, the issues must be resolved primarily upon what is best for the children. *See Fennelly*, 737 N.W.2d at 101*; see also Hansen*, 733 N.W.2d at 695; *Dale*, 555 N.W.2d at 245. In considering what custody arrangement is in the best interest of the children, the court must weigh the factors set out under Iowa Code section 598.41(3) (2013). Relevant here are the questions of "[w]hether the parents can communicate with each other regarding the child[ren's] needs" and "[w]hether each parent can support the other parent's relationship with the child[ren]." *See* Iowa Code § 598.41(3)(c), (e).

Upon our de novo review of the record, we agree with the district court that Adam failed to carry the burden of showing a "substantial change" in circumstances or that he can provide "superior care." Though the court did not expressly state it found Jennifer to be more credible than Adam, that finding is implicit in its ruling. *See, e.g., Reiss v. ICI Seeds, Inc.*, 548 N.W.2d 170, 175 (Iowa Ct. App. 1996) ("Although the trial court made no express finding in this regard, this determination is implicit in the court's ruling."). The court did state it "attempted to reconcile the conflicts in the evidence, but in the final analysis accepted the evidence it found more believable." Though we are not bound by

the court's credibility determinations, upon our de novo review of the record, we find no reason to disturb the court's findings for the following reasons.

Here, most of Adam's criticisms of Jennifer stem from her being a single mother of three children and her struggle to stay current on various bills. Though Adam certainly established Jennifer was struggling financially, he did not, as he advances in his appellate brief, show that she was unable to provide the children "basic necessities." Moreover, though Jennifer presently has financial difficulties, the evidence at trial was that the parents had similarly struggled financially during their marriage; therefore, Jennifer's present financial circumstances had to have been contemplated by the court when the decree was entered. Likewise, the evidence at trial was that each parent's parenting style had not changed since the dissolution of the marriage decree; Jennifer has always been less structured than Adam. Adam agreed to place the children in Jennifer's physical care after their divorce even with her parenting style and financial hardships. He failed to show that there was a substantial change in circumstances since the time of the decree not contemplated by the court when the decree was entered.

Furthermore, Adam's treatment of Jennifer in his communications shows he has little-to-no interest in co-parenting the parties' children. He would only communicate with her via email or text messages, telling her at one point that he would not listen to any voice messages left by her. Jennifer attempted to work with Adam and communicate his way, but his emails and text messages were regularly derogatory and disrespectful—just a small sampling of those communications include Adam calling Jennifer dumb, evil, and a liar on multiple occasions. If Jennifer did not answer immediately, he "assume[d she was]

ignoring [him]." When he did not get his way, he generally threatened to, and at times did, bring the children into their debates, saying he would "let the kids know [her] decision" to make her the bad guy or claim Jennifer was punishing them. When he registered the children for sports closer to where he lived, he did not even list her as a parent on the form.

Adam himself testified he was ashamed of how he came across in his emails and texts, though he claimed he "had no ill intent whatsoever" and that Jennifer had "cherry-picked" their communications she provided at trial. Yet, he did not provide any evidence that was the case except his own statement. Moreover, the messages in the record seem to flow as if there is no content missing. By the time of trial, Adam's emails and text messages had become more pleasant with smiley faces attached, though he admitted at trial his attorney had told him he was "too direct" and "too black and white" in his communications. At trial, Adam would initially pay lip service to contributing to the parties' communication problems, only to go on to blame Jennifer for the problems. We are not convinced he has made any improvements to his treatment of Jennifer in his communications.

Adam argues the children's best interests demand the children be moved to his physical care, citing testimony of various counselors concerning the children's need for consistency and stability, as well as the request of the parties' eleven-year-old child to live with Adam. We do not find the testimony or request rose to the level of a substantial change in circumstances or supported Adam's assertion he was the superior caregiver. One of the counselors that first worked with the parents' two youngest children—including the one that was spanked to a

state of bruising—testified she did not believe the children were being coached by Jennifer in their statements to her. The children told her of other spankings by Adam, as well as instances of Adam pulling their hair and ears and making them eat soap. The children told the counselor they were afraid to return to Adam's home. It appears Adam initially told this counselor the child's bruised buttocks could have come from the children horsing-around or could have been from Jennifer, though he admitted to spanking the children to others; in any event, he denied the hair- and ear-pulling. This counselor ultimately withdrew from the case because of the high-conflict between Adam, Jennifer, the attorneys, and the Department. She testified she felt Adam was manipulative and intimidating at times, and she did not believe, based upon her work with the children, that the spanking incident was an isolated incident in Adam's home, though she admitted she had not seen any other bruising. She testified she and Jennifer were concerned Adam was too strict. She testified she found Jennifer to be emotionally stable and felt she was very concerned about the children and their safety.

The children's current therapist testified Jennifer and Adam were both good parents who love their children. She testified she believed the children needed structure which Adam could better provide, but she admitted Jennifer would have an easier time parenting if she had a cooperative co-parent. She testified the children were more emotionally connected to Jennifer than Adam.

Perhaps most telling are the ear-pulling incidents. While this may or may not be an appropriate form of punishment, Adam adamantly denied at trial he had *ever* pulled the children's ears or hair. This is notwithstanding the youngest

child's bruised ear at the time of the bruised-buttocks incident, all of the children's reports after the butt-spanking incident that Adam had also pulled the child's ear, and another report by the same child to his current therapist in February 2014 that Adam had pulled his ear.  The therapist testified she talked to Adam about it after the child mentioned it in 2014, and Adam "said that was pre the time when he was held accountable for a child abuse incident and that he has since not had any physical contact like that."  Yet, Adam testified at trial he had *never* pulled the child's ears.  We are not convinced; rather, this appears to be the type of structure and consistency Adam will provide.

Finally, though we consider the oldest child's request to live with Adam in our analysis, taking into account her age and maturity, we do not find this is in her best interests.  *See* Iowa Code § 598.41(3)(f); *see also Hansen*, 733 N.W.2d at 696 (stating although section 598.41(3) does not expressly apply to physical care decisions, the factors in the statute are relevant considerations); *Jones v. Jones*, 175 N.W.2d 389, 391 (Iowa 1970) ("[W]hen a child is of sufficient age, intelligence, and discretion to exercise an enlightened judgment, his or her wishes, though not controlling, may be considered by the court, with other relevant factors, in determining child custody rights.").  Although the preteen daughter's preference is significant in our view, it is entitled to less weight in this modification action than it would be given when allocating physical care in an original custody proceeding.  *See In re Marriage of Zabecki*, 389 N.W.2d 396, 399-400 (Iowa 1986); *Smith v. Smith*, 133 N.W.2d 677, 681 (Iowa 1965).

We do not find Jennifer to be the perfect parent.  No such parent exists. But the overwhelming evidence at trial was that Adam was generally unwilling

and unable to support Jennifer's relationship with the children or to communicate with her regarding the children. While we hope the spanking incident was indeed isolated, given Adam's denial of the ear-pulling incidents, we do not find the children's best interests require placement with Adam. Upon our de novo review of the record, we agree with the district court that Adam failed to show there had been a "substantial change" of circumstances not contemplated at the time of entry of the decree or that he was the superior caregiver. Accordingly, we affirm on this issue.

### B. Visitation.

Adam alternatively argues that the district court should not have restricted his visitation schedule with the children, and, if anything, it should have given him more visitation time. A parent seeking to modify the visitation provisions of a dissolution decree must show a material change in circumstances since the decree and that the requested change in visitation is in the best interest of the children. *In re Marriage of Salmon*, 519 N.W.2d 94, 95-96 (Iowa Ct. App. 1994). This burden is less demanding than the burden required to modify a custodial provision in a dissolution decree. *See In re Marriage of Brown*, 778 N.W.2d 47, 51 (Iowa Ct. App. 2009).

Generally, liberal visitation rights are in the children's best interests. *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). The noncustodial parent should have "liberal visitation rights where appropriate" to "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." *See* Iowa Code § 598.41(1). However, it is the children's best interests that must prevail. *Stepp*, 485 N.W.2d at 849. Consequently, the

court must fashion a visitation schedule that serves the best interests of the children. *In re Marriage of Gensley*, 777 N.W.2d 705, 718 (Iowa Ct. App. 2009). Again, we give deference to the district court's opportunity to view the witnesses and determine the facts, *see Nicolou v. Clements*, 516 N.W.2d 905, 906 (Iowa Ct. App. 1994), and, recognizing that court's discretion, we "will not disturb its decision unless the record fairly shows it has failed to do equity." *Salmon*, 519 N.W.2d at 95.

Here, having reviewed the record de novo, we agree with the district court that, for essentially the same reasons as stated above, Jennifer established that a material change in circumstances existed and that the children's best interests warranted modification of Adam's visitation schedule. The record clearly evidences that the parties continue to have communication issues and that the children need a more structured and stable schedule. Modifying the schedule so that they are predominantly in one home with one parent will help stabilize their schedules and continuity in their lives. Jennifer has supported Adam's relationship with the children and has tried to communicate effectively with Adam. Upon our de novo review of the record, we find no reason to disturb the court's modification of Adam's visitation schedule.

That being said, this court expects the parties will follow through with the current court-ordered parenting schedule and facilitate a healthy and nurturing environment for their children. We remind the parents that "[e]ven though [they] are not required to be friends, they owe it to [their] child[ren] to maintain an attitude of civility, act decently toward one another, and communicate openly with each other." *In re Marriage of Grantham*, 698 N.W.2d 140, 146 (Iowa 2005); *see*

*also In re Marriage of Crotty*, 584 N.W.2d 714, 716 (Iowa Ct. App. 1998) ("Iowa courts do not tolerate hostility exhibited by one parent to the other."). It is time for the parents to put their children first and work together as grownups for the best interests of everyone, and we trust they understand the importance of showing respect for one another as they continue their joint-parenting venture.

### C. Trial Attorney Fees.

Adam also challenges the district court's award of trial attorney fees to Jennifer in the amount of $3000. An award of trial attorney fees rests in the sound discretion of the district court, and, to overturn the award, a party must establish the district court abused its discretion. *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994). An award of attorney fees depends on the parties' ability to pay and the reasonableness of the fees. *Id.* We find no abuse of discretion in the court's award of trial attorney fees to Jennifer.

### D. Appellate Attorney Fees.

Finally, Jennifer requests appellate attorney fees. Such an award rests in our discretion and is based on the merits of the appeal, the parties' needs, and their ability to pay. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). In arriving at our decision, we consider the parties' needs, ability to pay, and the relative merits of the appeal. *Id.* Here, Jennifer has not provided an affidavit of attorney fees with documentation to support her request. Nevertheless, considering the relevant factors as applied to the facts of this case, we find an award of appellate attorney fees to Jennifer is appropriate. We accordingly remand the case to the district court to determine the amount of appellate attorney fees to be paid by Adam and to enter judgment against Adam

in a reasonable amount. *See, e.g.*, *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005) ("[U]nder our current practice, the issue of appellate attorney fees is frequently determined in the first instance in the district court because of the necessity for making a record." (quoting *Lehigh Clay Prods., Ltd. v. Iowa Dep't of Transp.*, 545 N.W.2d 526, 528 (Iowa 1996)).

### *IV. Conclusion.*

Upon our careful de novo review of all of the evidence presented, weighing the best interests considerations set forth above, and giving weight to the district court's fact and credibility findings, we agree with the court's determinations that Adam failed to show there had been a "substantial change" of circumstances not contemplated at the time of entry of the decree or that he was the superior caregiver and that Jennifer established her burden to modify the visitation schedule. We also find no abuse of discretion by the district court in its award of trial attorney fees to Jennifer. We therefore affirm its modification order in all respects. However, we remand the matter to the district court to determine the amount of appellate attorney fees to be paid by Adam and to enter judgment against Adam in a reasonable amount. We do not retain jurisdiction. Costs on appeal are assessed to Adam.

**AFFIRMED AND REMANDED.**